No. 25-2888

# In the United States Court of Appeals for the Third Circuit

AMY WAX,

*Appellant*,

v.

THE TRUSTEES OF THE
UNIVERSITY OF PENNSYLVANIA,

*Appellee*,

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(The Honorable Timothy J. Savage)
(No. 2:25-CV-00269)

## APPELLANT'S OPENING BRIEF

Kellen S. Dwyer
Jason B. Torchinsky
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
2300 N Street NW Suite 643
Washington, D.C. 20037
Tel. (202) 737-8808

Alexander Haberbush
*Counsel of Record*
CONSTITUTIONAL COUNSEL GROUP
444 W Ocean Blvd. Suite 1403
Long Beach, CA 90802
Tel. (562) 435-9062

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ ii

STATEMENT OF JURISDICTION ................................................................... 1

RELATED CASES AND PROCEEDINGS ...................................................... 1

STATEMENT OF THE CASE .......................................................................... 3

SUMMARY OF ARGUMENT ........................................................................ 11

STANDARD OF REVIEW .............................................................................. 12

ARGUMENT ................................................................................................... 13

I. The District Court Erred as a Matter of Law in Dismissing Professor Wax's
Claims Under Title VI and Section 1981. ............................................... 13

a. The text of Title VI and Section 1981 is materially different from the text of
Title VII. .......................................................................................... 14

b. Professor Wax adequately pleaded that she was punished under Penn's race-
based double standard for regulating employee speech. ................... 19

c. Professor Wax also alleged viable claims under both Title VI and Section
1981 for retaliation. ........................................................................ 23

II. The District Court Improperly Treated Penn's Disciplinary Accusations as True
on a Rule 12(b)(6) Motion. ..................................................................... 32

CONCLUSION ................................................................................................ 36

COMBINED CERTIFICATIONS .................................................................... 37

CERTIFICATE OF SERVICE ......................................................................... 38

# TABLE OF AUTHORITIES

## Cases

*Amy Wax v. The Trustees of the University of Pennsylvania*,
 No. 2025-28059 (Ct. of Common Pleas, Montgomery Cnty, Nov. 14, 2025) ......1, 11

*Ashcroft v. Iqbal,*
 556 U.S. 662 (2009) ................................................................................13

*Astaraee v. Villanova Univ.*,
 509 F. Supp. 3d 265 (E.D. Pa. 2020) .........................................................16

*Barrett v. Whirlpool Corp.*,
 556 F.3d 502 (6th Cir. 2009) ...................................................................25

*Bloomberg v. New York City Dep't of Educ.*,
 119 F.4th 209 (2d Cir. 2024) .......................................................26, 27, 28

*Canaan v. Carnegie Mellon Univ.*,
 760 F. Supp. 3d 306 (W.D. Pa. 2024).........................................................16

*Castleberry v. STI Grp.*,
 863 F.3d 259 (3d Cir. 2017) ...............................................................15, 18

*CBOCS West, Inc. v. Humphries*,
 553 U.S. 442 (2008)...............................................................................24

*Connelly v. Lane Constr. Corp.*,
 809 F.3d 780 (3d Cir. 2016) ....................................................................20

*Crawford v. Metro. Gov't of Nashville & Davidson Cty.*,
 555 U.S. 271 (2009)................................................................................29

*Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*,
 450 F.3d 130 (3d Cir. 2006) ...............................................................25, 29

*Daniels v. Sch. Dist. of Phila.*,
 776 F.3d 181 (3d Cir. 2015) ....................................................................25

*Doe v. Princeton University*,
 30 F.4th 335 (3d Cir. 2022) ...............................................................34, 35

EEOC Charge No. 530-2025-03355 (filed Jan. 31, 2025) ............................................1

*Fowler v. UPMC Shadyside*,
 578 F.3d 203 (3d Cir. 2009) ....................................................................13

*Ganzzermiller v. Univ. of Maryland Upper Chesapeake Med. Ctr.*,
 No. CV CCB-16-3696, 2019 WL 4751457 (D. Md. Sept. 30, 2019) ......................17

ii

*Gratz v. Bollinger*,
539 U.S. 244 (2003)......................................................................16

*Jackson v. Birmingham Bd. of Educ.*,
544 U.S. 167 (2005)......................................................................29

*Johnson v. University of Cincinnati*,
215 F.3d 561 (6th Cir. 2000) .......................................................25

*Kanter v. Barella*,
489 F.3d 170 (3d Cir. 2007) .........................................................13

*Katchur v. Thomas Jefferson Univ.*,
354 F. Supp. 3d 655 (E.D. Pa. 2019)......................................16, 24

*Kengerski v. Harper*,
6 F.4th 531 (3d Cir. 2021) ............................................................25

*Kimmel v. Gallaudet Univ.*,
639 F. Supp. 2d 34 (D.D.C. 2009)............................................27, 28

*Lei Ke v. Drexel Univ.*,
645 F. App'x 161 (3d Cir. 2016) ..................................................24

*OFI Asset Mgmt. v. Cooper Tire & Rubber*,
834 F.3d 481 (3d Cir. 2016) .........................................................12

*Otis v. Demarasse*,
886 F.3d 639 (7th Cir. 2018) ........................................................35

*Papelino v. Albany Coll. of Pharm. of Union Univ.*,
633 F.3d 81 (2d Cir. 2011) ...........................................................28

*Peters v. Jenney*,
327 F.3d 307 (4th Cir.2003) ......................................................24, 25

*Ricketts v. Wake Cty. Pub. Sch. Sys.*,
125 F.4th 507 (4th Cir. 2025) ....................................................24, 29

*Rivera v. New Castle County Police Department*,
152 F.4th 147 (3d Cir. 2025) ........................................................34

*Sherman v. Town of Chester*,
752 F.3d 554 (2d Cir. 2014) .........................................................19

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
600 U.S. 181 (2023).......................................................16, 27, 29, 30

*Sullivan v. Little Hunting Park*,
396 U.S. 229 (1969)..................................................................25, 29

*Swierkiewicz v. Sorema N. A.*,
   534 U.S. 506 (2002) ................................................................................20

*T.R. Hoover Cmty. Dev. Corp. v. City of Dallas*,
   No. CIV A 306-CV-2148-O, 2009 WL 2001442, (N.D. Tex. July 9, 2009) ...........17

*Watson v. Rozum*,
   834 F.3d 417 (3d Cir. 2016) .................................................................24

*Whitfield v. Notre Dame Middle Sch.*,
   412 F. App'x 517 (3d Cir. 2011) (unpublished) .................................24, 25

*Williams v. Pennridge Sch. Dist.*,
   782 F. App'x 120 (3d Cir. 2019) ............................................................24

## Statutes and Constitutional Provisions

28 U.S.C. § 1291 ...................................................................................1

28 U.S.C. § 1331 ...................................................................................1

28 U.S.C. § 1367 ...................................................................................1

42 U.S.C. § 12101 *et seq* ......................................................................14

42 U.S.C. § 1981 ..........................................................................passim

42 U.S.C. § 1982 ..................................................................................25

42 U.S.C. § 2000d-3 ............................................................................25

42 U.S.C. §§ 2000d *et seq.* ("Title VI") .................................................passim

42 U.S.C. §§ 2000e *et seq.* ("Title VII") ................................................passim

U.S. Const. amend. I ...........................................................................8, 9

## Other Authorities

Wax, Amy, "Caring Enough: Sex Roles, Work, and <u>Taxing Women</u>," 44 Villanova L.
   Rev. 495 (1999) ....................................................................................4

Wax, Amy, "Discrimination as Accident," 47 Indiana Law J. 1129 (Fall 1999) ...........4

Wax, Amy, "Disparate Impact Realism: A Proposal to Alter or Abolish Disparate
   Impact Liability," 53 William and Mary Law Review 621 (2011) ......................5, 6

Wax, Amy, "Engines of Inequality: Race, Class, and Family Structure," 41 Family
   Law Quarterly (Fall 2007) ......................................................................5

Wax, Amy, "Rethinking Welfare Rights: Reciprocity Norms, Reactive Attitudes and
   the Political Economy of Welfare Reform," 63 Law & Contemporary Problems 257

iv

(Winter/Spring 2000) ................................................................................ 4

Wax, Amy, "Something for Nothing: Liberal Justice and Welfare Work
Requirements," 52 Emory L.J. 1 (Winter 2003) ....................................... 5

Wax, Amy, "The Discriminating Mind: Define It, Prove It," 40 University of
Connecticut Law Review 979 (Winter 2008) ............................................ 5

Wax, Amy, "The Two-Parent Family in the Liberal State: The Case for Selective
Subsidies," 1 Mich. J. Race & L. 491 (1996) ............................................ 4

Wax, Amy, "Too Few Good Men," 134 Policy Review (Dec. 2005/Jan. 2006) ........... 5

Wax, Amy, Race, Wrongs and Remedies: Group Justice in the 21st Century (Hoover
Institution Press/Rowman and Littlefield (2009) ....................................... 5

## Rules

Fed. R. App. P. 4(a) ................................................................................ 1

Fed. R. Civ. P. 12(b)(6) ........................................................................ 11, 13

Fed. R. Civ. P. 41(a)(1)(A)(i) ................................................................ 14

## STATEMENT OF JURISDICTION

Jurisdiction in the district court was based on 28 U.S.C. § 1331 for the federal claims, and 28 U.S.C. § 1367 for the state claims. Jurisdiction in this Court is pursuant to 28 U.S.C. § 1291, timely filed pursuant to Fed. R. App. P. 4(a) on September 26, 2025, after the district court entered final judgment on August 28, 2025.

## RELATED CASES AND PROCEEDINGS

Following the district court's dismissal without prejudice of Plaintiff's state claims, Plaintiff filed a separate action in state court to preserve her rights. That case, *Amy Wax v. The Trustees of the University of Pennsylvania*, No. 2025-28059 (Ct. of Common Pleas, Montgomery Cnty, Nov. 14, 2025), is currently stayed pending resolution of this appeal. This case has not been before this Court previously.

Before Plaintiff filed any lawsuit, Plaintiff filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"). EEOC Charge No. 530-2025-03355 (filed Jan. 31, 2025). The EEOC terminated its processing of this charge and provided Plaintiff with a Notice of Right to Sue on February 6, 2025.

## STATEMENT OF THE ISSUES WITH
## STATEMENT OF PLACES RAISED AND RULED

1. Whether the district court erred in dismissing Professor Wax's claims under Title VI and 42 U.S.C. § 1981 based on Title VII's "*because of such*

*individual's race*" language that does not appear in either Title VI or Section 1981, contending that the "anti-discrimination statutes protect speakers, not speech." Raised: Am. Compl. ¶¶ 135, 150, Appx66, 68; Ruled: Mem. Op. 7, 10, 13-14, Appx10, 13, 16-17.

2. Whether the district court erred in failing to treat the University of Pennsylvania's race-based double standard for imposing discipline based on faculty members' speech as discrimination that is actionable under both Title VI and 42 U.S.C. § 1981. Raised: Am. Compl. ¶¶ 136-147, 152-161, Appx65-69; Ruled: Mem. Op. 7-10, 13-14, Appx10-13, 16-17.

3. Whether the district court erred in failing to treat the University of Pennsylvania's adverse employment action against Professor Wax as actionable retaliation under both Title VI and 42 U.S.C. § 1981 for her speech opposing race-based discrimination in federally funded programs and advocating for the rights of protected classes. Raised: Am. Compl. ¶¶ 131-133, 143-146, 148-155, Appx66-68; Ruled: Mem. Op. 10, 13-14, Appx13, 16-17.

4. Whether the district court erred in accepting as true disputed allegations and inferences offered by the University of Pennsylvania when granting its motion to dismiss, merely because Professor Wax attached the University's disciplinary determinations as exhibits to her complaint. Raised: Am. Compl. ¶¶ 70-74, 118, Appx46-51, 63; Ruled: Mem. Op. 6, 9 & n.34, 13-14, Appx9, 12, 16-17, 19.

**STATEMENT OF THE CASE**

Plaintiff-Appellant Amy Wax is a nationally renowned scholar who is one of the few conservatives on the faculties of the nation's most prestigious Ivy League Universities. She has a B.S. Degree (*summa cum laude*) in molecular biophysics and biochemistry from Yale University, studied Philosophy, Psychology, and Physiology as a Marshall Scholar at the University of Oxford, received an M.D. (*cum laude*, with distinction in neuroscience) from Harvard Medical School (while simultaneously beginning her legal studies at Harvard Law School), and earned a J.D. from Columbia Law School, which she completed following a residency in neurology at the New York Hospital-Cornell Medical Center. After law school, she served as a law clerk for Judge Abner Mikva on the U.S. Court of Appeals for the D.C. Circuit, which is one of the most prestigious appellate court clerkships in the country. She then worked in the Office of the Solicitor General of the United States, arguing 15 cases before the Supreme Court during her 6-year tenure before accepting a teaching position at the University of Virginia School of Law.[1]

---

[1] The biographical information in this paragraph and elsewhere, as well as the scholarly work cited below, is available on Penn's website at https://www.law.upenn.edu/live/files/11427-cvawaxpdf and also would have been considered by Penn at several points, including: 1) its decision to hire Professor Wax with tenure in 2001; 2) its decision to award her with the Robert Mundheim Professorship in 2007; and 3) its decision to award her with the Lindback award for teaching excellence in 2015, the supporting files for which were explicitly requested by Professor Wax during the course of Penn's disciplinary proceedings. *See, e.g.,* Am. Compl. Exs. 13, 17, Appx158, 199-200.

It is therefore no exaggeration to say that Professor Wax is a highly credentialed and experienced legal scholar. Her mix of medical, philosophical, and legal training makes her uniquely well-qualified to analyze and comment on some of the most difficult and controversial issues involving race and social welfare policy that our nation has faced and continues to confront. Her scholarly work while she was on the faculty at the University of Virginia dealt with difficult issues of race and sex from a conservative perspective including, for example, articles such as "The Two-Parent Family in the Liberal State: The Case for Selective Subsidies," 1 Mich. J. Race & L. 491 (1996); "Discrimination as Accident," 47 Indiana Law J. 1129 (Fall 1999); "Caring Enough: Sex Roles, Work, and Taxing Women," 44 Villanova L. Rev. 495 (1999); and "Rethinking Welfare Rights: Reciprocity Norms, Reactive Attitudes and the Political Economy of Welfare Reform," 63 Law & Contemporary Problems 257 (Winter/Spring 2000). In this work, Professor Wax argued, inter alia, against welfare payments for single mothers, against legal liability for unconscious racial bias, and in favor of work requirements for receiving public welfare benefits—all unpopular positions in legal academia.

All of this was well known to the University of Pennsylvania (a private university founded in 1755 by Benjamin Franklin) when, in 2001, it recruited her away from her tenured position at the University of Virginia with explicit promises of academic freedom and due process as robust as the First and Fourteenth Amendment protections she enjoyed at that public university (founded in 1819 by Thomas

Jefferson). Am. Compl. ¶¶ 107-110 and Exs. 1-3, 13, 14, Appx60-61, 83-92, 158-165. Wax relied on those promises when accepting the position at Penn, *id.* ¶ 110, Appx61, and her propensity for confronting difficult issues of race, sex, identity politics, and social welfare policy in her scholarship continued apace after the University of Pennsylvania hired her as a tenured law professor in 2001 and conferred a named professorship on her in 2007. "Something for Nothing: Liberal Justice and Welfare Work Requirements," 52 Emory L.J. 1 (Winter 2003); "Too Few Good Men," 134 Policy Review (Dec. 2005/Jan. 2006); "Engines of Inequality: Race, Class, and Family Structure," 41 Family Law Quarterly (Fall 2007); "The Discriminating Mind: Define It, Prove It," 40 University of Connecticut Law Review 979 (Winter 2008); Race, Wrongs and Remedies: Group Justice in the 21st Century (Hoover Institution Press/Rowman and Littlefield (2009); and "Disparate Impact Realism: A Proposal to Alter or Abolish Disparate Impact Liability," 53 William and Mary Law Review 621 (2011), are just a few of the works authored by Professor Wax after assuming her position at Penn. Any one of these articles contained factual assertions and opinions which could arguably have been the basis for discipline under Penn's new, watered-down and discriminatorily applied policies on academic free expression. In the *Disparate Impact Realism* article, for example, Professor Wax reviewed and described "work in psychometrics, educational demography, and labor economics," which "indicates that blacks, and to a lesser extent Hispanics, currently lag behind whites both in cognitive ability test performance and

in the skills needed for success on the job," and that the "combination of well-documented racial differences in cognitive ability and the consistent link between ability and job performance generates a pattern that experts term the 'validity-diversity tradeoff.'" 53 Wm. & Mary L. Rev. at 623. Yet far from taking disciplinary action against Professor Wax for anything contained in these articles, Penn awarded her with an endowed professorship in 2007, Am. Compl. ¶ 38, Appx40, and granted her awards for teaching excellence in 2005 and 2015, including the prestigious university-wide Lindback Prize, for which she was recommended by the then law school Dean Michael Fitts, and which had previously been awarded to fewer than a handful of Penn law professors.

All that changed in 2017 after her co-authorship of an article describing the "Breakdown of the Country's Bourgeois Culture," which characterized that breakdown as "especially damaging to disadvantaged groups, including racial minorities." *Id*. ¶ 39, Appx40. Although the article contained nothing any more controversial, or less supported, than the content of her previous articles, times had changed. "Cancel culture," "Woke ideology," and DEI initiatives had taken root on college campuses across the land, and especially at Ivy League Universities like Penn, fundamentally undermining core principles of academic freedom and merit. Faculty, students, and alumni of Penn, as well as outside agitators, demanded that the administration take action against Wax, up to and including termination. *Id*. ¶ 40, Appx40. After Wax's critical comments on Penn Law's affirmative action

practices in a podcast with Brown University economics Professor Glenn Loury came to light, the Dean of the Law School, Theodore Ruger, barred Wax from teaching first-year courses. *Id.* Ex. 4, Appx94. Further disciplinary action soon followed, and in March 2022, Dean Ruger filed a "charging document" against Wax, accusing her of committing a "major infraction" of university policies for her mostly extra-curricular speech on the sensitive topics about which Wax had been writing and commenting for years. (The charges also included a few unproven and distorted allegations of comments to students). *Id.* Exs. 4, 16, Appx93, 96-99, 199. After a stacked process that, as alleged, included intentional suppression of an exonerating report prepared at the Penn General Counsel's request by an outside scholar, Professor (and former Dean) Dan Rodriguez of Northwestern Law School, and interference with the Tenure Right to gather information about and move to disqualify hearing board members for bias, *id.* ¶ 118, Appx63,[2] the University ultimately stripped Wax of her named professorship, suspended her from teaching for a year at half pay, permanently barred her from summer research stipends, and issued a public reprimand. *Id.* ¶¶ 2, 82, Appx28, 52-53.

The imposition of these penalties is an egregious violation of Penn's

---

[2] The numerous procedural violations, including the inappropriateness of bringing charges against Professor Wax at all, are discussed at length in the report prepared for Penn's Senate Committee on Academic Freedom and Responsibility by Jules van Binsbergen, a member of the Committee. Am. Compl. ¶ 119 and Ex. 12, Appx152.

contractual promises of due process and academic freedom, which extend protections for speech by university members akin to those developed under the First Amendment to the Constitution. *Id.* ¶¶ 106-127, Appx60-65. Indeed, in testifying before Congress under oath in December 2023, Penn's then university president, Elizabeth Magill, stated that, in its protections for expression by university members, Penn "is guided by the U.S. Constitution" and gives "broad protection to free expression—even expression that is offensive." *Id.* Ex. 15, Appx168. In practice, however, Penn only affords such protections to university members whose speech targets less-favored racial groups, such as Jews.

For example, in the years following the October 7, 2023, Hamas terrorist attacks against Israel, Penn took no action against students, faculty, and staff who openly advocated for violence against Jewish people. *E.g.*, *id.* ¶¶ 10-12, 17-18, Appx30-31, 34. Indeed, despite a request from Governor Shapiro to do so in the name of public safety and reports of terrorist flags, weapons, vandalism, and anti-semitic harassment on campus, the Faculty Senate Executive Committee at Penn voted against disbanding an "encampment" of anti-Israel activists in May 2024. *Id.* ¶¶ 88-89, Appx55. Penn likewise declined to sanction Anne Norton, a professor and member of the Faculty Senate Executive Committee, who shared posts on social media that minimized and denied Hamas's atrocities against women and accused Jews of acting like "they are always already victims"; Ahmad Almallah, an artist-in-residence and lecturer, who led chants of "There is only one solution:

intifada revolution" at an anti-Israel rally; Dwayne Booth, a Penn employee and lecturer, who published cartoons that invoked the ancient, antisemitic "Blood Libel" by depicting Jews as Nazis who drink the blood of Palestinians; Jill Richards, a Penn librarian, who posted "I <3 Hamas" ("I love Hamas" translated from emoticon) on Facebook after the October 7 attacks; or Ibrahim Kobeissi, a Penn Health employee, who minimized Hamas's attacks, suggested Israel orchestrated October 7, and called members of Congress "retards" for supporting Israel on his social media pages. *Id.* ¶¶ 87-92, 98-105, Appx55-56, 58-60. Moreover, instead of sanctioning Huda Fakhreddine, an associate professor of Arabic literature at Penn's Middle East Center who has praised Hamas and said Israeli civilians are "legitimate military targets" and was thus "criticize[d] [] by name" in a January 24, 2024 letter to Penn from the House Committee on Education and the Workforce regarding Penn's inadequate response to campus antisemitism, Penn rewarded her by allowing her to teach a course subtitled "Resistance from Pre-Islamic Arabia to Palestine" in the semester immediately following the October 7 attacks. *Id.* ¶¶ 94-95, Appx56-57.

According to Penn, its refusal to initiate disciplinary proceedings in these examples stemmed from a principled commitment to academic free expression and the First Amendment. In fact, President Magill's statement that Penn's speech policy "is guided by the U.S. Constitution" was a direct response to a question from Representative Jim Banks about why Penn did not discipline Almallah for his

antisemitic chants. *Id.* ¶ 98, Appx58. Penn, however, applied an entirely different standard to Professor Wax: instead of considering whether Professor Wax's statements were protected by First Amendment principles of free expression, it considered whether her statements might make students "reasonably wonder whether they could be fairly educated and evaluated by her." *Id.* Ex. 8, Appx135-136.[3] This double standard has no basis other than Penn's preferences for some racial and ethnic groups over others—Jews and Israelis are lower on Penn's "intersectionality pyramid" and may be criticized with impunity by Penn employees, even to the point of calling for violence against them. Notably, Penn never claimed that Jewish students could "reasonably wonder" whether they would receive fair treatment from professors who advocated such violence and made remarks far worse than the "reasonably wonder" evidence Penn proffered against Professor Wax. But Penn's position is that other minorities may not be discussed, even in the context of debating public policy issues, if doing so might make members of those groups "reasonably wonder" whether they could be treated fairly. *Id.* ¶¶ 23-24, Appx36.

Penn's disciplining of Professor Wax in violation of its policies gives rise to

---

[3] This "reasonably wonder" standard—which appears in President Magill's decision adopting the sanctions against Professor Wax—does not appear in the relevant provisions of the Penn Faculty Handbook. *See* Am. Compl. Exs. 1-3, Appx83-92. In any event, students' fears that Wax might behave unfairly towards them are entirely unreasonable and without any objective foundation. In his investigative report, Professor Dan Rodriguez found no evidence that Wax had ever shown bias or discriminated against any student. *Id.* ¶ 42, Appx41.

state law breach of contract claims that were included in Professor Wax's complaint below pursuant to the federal court's supplemental jurisdiction under 28 U.S.C. § 1367.[4] But Penn's failure to honor its promises by adopting a discriminatory, race-based double standard for faculty expression, as well as its retaliatory actions against Wax, also gave rise to *federal* claims under various civil rights laws, including Title VI and Section 1981.

The district court granted Penn's motion to dismiss the federal claims under Rule 12(b)(6) for failure to state a claim. Mem. Op. 14, Appx17. It then dismissed Professor Wax's pendent state claims without prejudice. Order ¶ 2, Appx3.

## SUMMARY OF ARGUMENT

This Court should reverse for two independent reasons. The district court dismissed Professor Wax's claim under Title VII on the ground that she had not alleged that the actions taken against her by Penn were "because of" her race or her membership in any other statutorily protected category. Professor Wax does not challenge that determination on appeal. But the district court also dismissed

---

[4] Those state claims were dismissed without prejudice by the district court once it dismissed the federal claims, and they are not at issue on this appeal. Professor Wax subsequently filed an action for breach of contract in state court to preserve her rights. *See Amy Wax v. The Trustees of the University of Pennsylvania*, No. 2025-28059 (Ct. of Common Pleas, Montgomery Cnty, Nov. 14, 2025). A joint application by all parties for a stay of that action pending resolution of her appeal here was granted on December 17, 2025. *See id.* at DE 11. The state claims will once again be consolidated with her related federal claims if the latter are restored upon appeal.

Professor Wax's claims under Title VI and Section 1981 on the same ground without paying heed to the substantively different language in those two statutes. Title VI prohibits discrimination "on the ground of race" in federally funded programs, and Section 1981 prohibits intentional discrimination "on the basis of race"; neither statute contains Title VII's "because of *such individual's race*" limitation (emphasis added). On a proper reading of those statutes, Professor Wax's Amended Complaint easily survives Penn's motion to dismiss, and the decision by the district court below granting that motion should be reversed.

The district court also committed a fundamental, reversible error in its application of well-established rules regarding motions to dismiss. Such a motion can only be granted if the well-pleaded facts alleged by a plaintiff, which must be taken as true, are insufficient to support the causes of action as a matter of law. The district court failed to apply that rule by treating *Penn's* version of disputed facts as true, merely because they were contained in the disciplinary documents authored by Penn that were affixed as exhibits to the complaint in order to demonstrate Penn's flawed process and unsupported factual conclusions. The decision below must therefore be reversed on this important procedural ground as well.

## STANDARD OF REVIEW

This Court's review of a district court's decision granting a party's motion to dismiss is "plenary." *OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 489 (3d Cir. 2016). "When ruling on a motion to dismiss under Rule 12(b)(6), a

court must 'accept as true all [factual] allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff.'" *Id.* (quoting *Kanter v. Barella*, 489 F.3d 170, 177 (3d Cir. 2007)). A court should not dismiss a complaint under Rule 12(b)(6) for failure to state a claim for relief if the allegations of the complaint "set out 'sufficient factual matter' to show that the claim is facially plausible." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 677 (2009)). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678.

## ARGUMENT

### I.    The District Court Erred as a Matter of Law in Dismissing Professor Wax's Claims Under Title VI and Section 1981.

This case turns on a basic rule of statutory interpretation: courts may not graft limiting language from one civil rights statute onto another where Congress chose materially different text. The text contained in Title VI and Section 1981 is broader than that contained in Title VII, and under that broader text, Professor Wax's well-pleaded allegations stated viable claims under Title VI as well as Section 1981, both for Penn's race-based discriminatory double standard in the application of its academic freedom principles and disciplinary process, and in its retaliation for Professor Wax's speech addressing race-based violations of law. The

13

district court's holding to the contrary was erroneous.

### a. The text of Title VI and Section 1981 is materially different from the text of Title VII.

The district court dismissed all three of Professor Wax's federal civil rights claims— Count 2, 42 U.S.C. § 1981 ("Section 1981"); Count 3, 42 U.S.C. §§ 2000d *et seq.* ("Title VI"); and Count 5, 42 U.S.C. §§ 2000e *et seq.* ("Title VII")[5]—on the same ground, namely, that Professor Wax had not "plausibly al-lege[d] that she was subjected to intentional discrimination *because of her race*." Mem. Op. 7, Appx10 (emphasis added). Yet the text on which the court relied ap-pears only in Title VII; Professor Wax's claims under the broader wording con-tained in Title VI and Section 1981, which do not require that racially discrimina-tory conduct be based on the *plaintiff's* race, should not have been dismissed.

Title VII provides that "[i]t shall be an unlawful employment practice for an employer—(1) to … otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, *because of such individual's race*, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2 (emphasis added). Title VI states, in contrast, that "[n]o person in the United States shall, *on the ground of race*, color, or national origin, be excluded from

---

[5] Professor Wax had previously dismissed her claim under the Americans with Disa-bilities Act (ADA), 42 U.S.C. § 12101 *et seq.* (Count 6) pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i).

participation in, be denied the benefits of, or be subjected to discrimination under

any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d

(emphasis added). And the text of Section 1981 of the Civil Rights Act has been

interpreted by this Court as requiring "an intent to discriminate *on the basis of*

*race*," *Castleberry v. STI Grp.*, 863 F.3d 259, 266 (3d Cir. 2017) (emphasis

added),[6] language quite like Title VI's "on the ground of race" and different from

Title VII's "because of such individual's race." The key language in Title VII—

"because of such individual's race"— simply does not appear in either Title VI or

Section 1981.

Those textual differences matter. As Professor Wax noted in her complaint:

"By its plain text, Title VI is not limited to discrimination based on the race of the

plaintiff, but instead prohibits *all* relevant actions taken 'on the ground of race,

color, or national origin' by recipients of federal funds." Am. Compl. ¶ 150,

Appx68.

To be sure, Title VI cases frequently arise in the context where a student is

discriminated against *because of that individual's* race or other protected

---

[6] The full text of Section 1981 is: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981.

characteristic, where the textual difference between Title VI's "on the ground of race" and Title VII's "because of that individual's race" is not material. Take the recent case involving Harvard's race-based admissions program. As the Supreme Court explained in invalidating the program as a violation of Title VI,[7] "College admissions are zero-sum. A benefit provided to some applicants [because of their race] but not to others [of a different race] necessarily advantages the former group at the expense of the latter." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 218-19 (2023). *See also, e.g.*, *Canaan v. Carnegie Mellon Univ.*, 760 F. Supp. 3d 306, 324 (W.D. Pa. 2024) (upholding Title VI claim by Jewish student for antisemitic actions and comments directed to her by professors); *Katchur v. Thomas Jefferson Univ.*, 354 F. Supp. 3d 655, 665 (E.D. Pa. 2019) (upholding Title VI claim by white applicant to medical school who was told by the director of admissions she would be granted admission if she were African American); *Astaraee v. Villanova Univ.*, 509 F. Supp. 3d 265, 270 (E.D. Pa. 2020) (denying motion to dismiss Title VI claim by Iranian student who alleged

---

[7] The Court's decision is framed in terms of the Fourteenth Amendment's Equal Protection Clause, which does not apply to private universities such as Harvard and Penn. But the decision made clear at the outset that, for private universities receiving federal funds, the requirements of Title VI are the same. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 198 n.2 (2023) ("We have explained that discrimination that violates the Equal Protection Clause of the Fourteenth Amendment committed by an institution that accepts federal funds also constitutes a violation of Title VI," citing *Gratz v. Bollinger*, 539 U.S. 244, 276, n. 23 (2003)).

direct national origin discrimination against him because of his Iranian national origin).

But the courts have also recognized the viability of Title VI claims in contexts *not* involving the race or other protected characteristic of the person bringing the claim, where the claim is nevertheless *grounded* in, or based on, race. For instance, claims can be brought by someone not in a protected class "on the ground of race" based on association with someone who is a member of a protected class. *See, e.g.*, *T.R. Hoover Cmty. Dev. Corp. v. City of Dallas*, No. CIV A 306-CV-2148-O, 2009 WL 2001442, at *6 (N.D. Tex. July 9, 2009) (dismissing such a claim on summary judgment for lack of evidence, not because the association claim was otherwise not viable); *see also Ganzzermiller v. Univ. of Maryland Upper Chesapeake Med. Ctr.*, No. CV CCB-16-3696, 2019 WL 4751457, at *9 (D. Md. Sept. 30, 2019) (citing numerous cases where courts have recognized "associational discrimination" claims—that is, claims brought by those not in a protected class who are discriminated against because of their association with covered individuals—under the Rehabilitation Act, which provides that victims of violations of that Act may seek the "remedies, procedures, and rights set forth in Title VI"). Claims may also be brought for retaliation by someone speaking out against violations of Title VI and Section 1981 even though the person retaliated against is not herself in a protected class. *See, e.g.,* Section I.c and cases cited therein.

As described below, Professor Wax plausibly alleged that the actions taken

against her were "on the ground of race" (Title VI) and "on the basis of race" (Section 1981, per *Castleberry*) in two ways. First, Penn employed a race-based double standard in the application of its disciplinary procedures and academic freedom protections to speech involving the topic of race, with less protection and harsher discipline applied to certain comments about some races (notably African Americans) but more lenient standards for comments directed at others (*e.g.*, Jews). Second, she alleged that Penn retaliated against her for her speech critical of Penn's race-based affirmative action policies and of society's race-based double standards and their adverse effects, and her assertions, at least by inference, that Penn was committing violations of Title VI and advocating for victims of such violations. As described below, those allegations are sufficient to support her claims under both Title VI and Section 1981. Yet the district court did not address the textual differences between those statutes and Title VII at all; it simply rejected all three counts with a holding that relied exclusively on Title VII's "because of such individual's race" language. Specifically, the district court held:

> To make out claims under Section 1981, Title VI, and Title VII, Wax must plausibly allege that she was subjected to intentional discrimination *because of her race*. Alleging that one was discriminated against *because of one's own protected characteristic* (race) is an essential element of a race discrimination claim.

Mem. Op. 7, Appx10 (emphasis added). That holding is erroneous, because it failed to recognize and apply a crucial textual distinction between Title VII, on the

one hand, and Title VI and Section 1981, on the other.

### b. Professor Wax adequately pleaded that she was punished under Penn's race-based double standard for regulating employee speech.

The allegations in the complaint that Penn employed a race-based, discriminatory double standard support Professor Wax's claims under the broader language contained in both Title VI and Section 1981. Professor Wax alleged that Penn disciplined her for statements about race to which it objected, while it simultaneously abstained from taking any action against university employees, including other professors, who engaged in egregious, antisemitic tropes and comments. Specifically, she alleged that under Penn's speech policies, "some races may not be criticized while other racial or ethnic groups can be—and routinely are—subjected to virulently racist speech without consequence." Am. Compl. ¶ 7, Appx29-30. One example alleged by Professor Wax was a depiction by another professor of Jews drinking the blood of Palestinians in Gaza, "mirroring the anti-Semitic Blood Libel trope that Jews drink the blood of Christian children." *Id.* ¶¶ 10, 14, Appx30, 32.[8] Although, as Professor Wax alleged, the cartoon was posted "at a time when violence against Jews on Penn's campus had reached unprecedented levels" and "could reasonably be interpreted as endorsing that violence," Penn "has taken no steps to initiate disciplinary proceedings against" that professor. *Id.* ¶¶ 11, 12,

---

[8] "Jews are considered a race for the purposes of §§ 1981 and 1982." *Sherman v. Town of Chester,* 752 F.3d 554, 567 (2d Cir. 2014).

Appx30-31. Instead, it hid "behind paeans to free speech and a supposed commit-ment to academic freedom to justify its decision not to lift a finger against" that professor, *id.* ¶ 13, Appx31, protections that its "radical double standard" denied to Professor Wax.[9] Indeed, Professor Wax's speech was not evaluated at all according to the constitutional principles that President Magill claimed during her congres-sional testimony govern Penn's speech policy, *id.* ¶¶ 98-99, Appx58-59, or accord-ing to the principles of academic freedom, as promised by Penn's Faculty Hand-book. *Id.* Ex. 1, Appx83-87. Such protections are only afforded to antisemitic and other favored speech under Penn's race-based speech policy. Professor Wax's speech was instead evaluated under a novel "reasonably wonder" standard, by which protected speech may become unprotected "conduct" if it could lead stu-dents to "reasonably wonder whether they could be fairly educated and evaluated by her." *See id.* ¶ 93, Appx56; *id.* Ex. 8, Appx132-133. As Professor Wax alleges, Penn employees like Anne Norton, Dwayne Booth, Ibrahim Kobeissi, and Huda Fakhreddine "would likely be facing disciplinary proceedings" if this standard were applied to them. *Id.* ¶¶ 13, 15-19, 93-94, 102-103, Appx31-34, 56, 59-60.

---

[9] At the pleading stage, Professor Wax is not required to identify a "perfect" compara-tor to establish or even plausibly allege discriminatory disparate treatment; she need only plead facts that, taken as true, raise a reasonable expectation that discovery will reveal evidence supporting an inference of discrimination. *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 510-12 (2002); *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 788–89 (3d Cir. 2016).

However, "because the[ir] speech concerned Israelis and Jews and sought to incite or legitimize violence against them" (as opposed to more-favored racial groups) and/or defended Palestinians, a group "belong[ed] to a racial classification higher up on the University's intersectionality pyramid," they "enjoyed absolute immunity under the University's Speech Policy." *Id.* ¶¶ 91, 103, Appx55-56, 60. This disparity in consequences for speech on racial topics raises a plausible inference of pretext based on the race of the speaker or the race of the group criticized.[10]

Moreover, Professor Wax is not alone in contending that Penn applies a race-related double standard. In the complaint, Professor Wax also cited statements by Pennsylvania Governor Josh Shapiro, contending that Penn and other colleges and universities in Pennsylvania had "lost [their] way" in their response to antisemitism on campus, "willing to accept a little bit of hate over here, but no hate over here." *Id.* ¶ 15, Appx32-33. The district court, however, did not credit

---

[10] In another example alleged by Professor Wax, a Penn professor chanted at a rally protesting Israel's response to the Hamas attacks on October 7, 2023 that "there is only one solution: intifada revolution," a clear call to violence against Israelis and Jews. Yet despite such an explicit call for violence, "under the University's racist Speech Policy," "the University predictably refused to initiate any disciplinary proceedings against" that professor. Am. Compl. ¶¶ 17-18, Appx34; *see also id.* ¶¶ 92-93, Appx56 (describing Penn's "Orwellian doublespeak" that allows a professor to stereotype "Young Jews" without discipline as "protected speech," while for other racial groups it is somehow unprotected 'conduct'"); *id.* ¶¶ 94-97, Appx56-58 (describing another professor's antisemitic speech and calls for violence against Jews, which Penn not only failed to penalize but rewarded by allowing the professor to teach a course that advanced her views).

Professor Wax's plausible allegations of a discriminatory, race-based double stand-ard. Instead, it concluded that the other examples of offensive speech in the com-plaint are "not comparable to the speech for which [Professor Wax] was sanc-tioned," as they reflected "comment[s] on political issues surrounding the Israeli-Hamas conflict," which were "not antisemitic" but simply "critical of Israel's treat-ment of Palestinians," Mem. Op. at 11, Appx14.

In reaching this conclusion, and notably in deciding that the pertinent state-ments were not antisemitic but merely "political" comments, the district court failed to view Professor Wax's allegations in the light most favorable to her, but instead interpreted them in the light most favorable to Penn (and the Penn employ-ees who made the statements). As just one example, the district court characterized Jill Richard's "I <3 Hamas" post as "not antisemitic" and simply a "comment[] on political issues," Mem. Op. at 11-12, Appx14-15, despite Professor Wax's more than plausible allegation that "expressing [] love for a terrorist group that had re-cently tortured and murdered Jews" is, in fact, "offensive speech targeting Jews" that would be punished if subjected to the same standards as Professor Wax. Am. Compl. ¶¶ 87, 101, Appx55, 59. At the same time, the district court failed to recog-nize that Wax's comments on affirmative action and other vexed and contested questions of racial policy count as much as "comments on political issues" as ques-tions surrounding Israeli-Palestinian relations. Moreover, the district court refused to apply the same positive inference granted to faculty commenting on the Israeli-

Palestinian conflict to Professor Wax's claims regarding her own non-derogatory motivations. *Compare* Am. Compl. ¶ 39, Appx40 ("In 2017, Plaintiff Wax and Larry Alexander published an opinion essay in the Philadelphia Inquirer entitled 'Paying the Price for Breakdown of the Country's Bourgeois Culture.' The essay argued that the loss of that culture . . . was especially damaging to disadvantaged groups, including racial minorities."), *with* Mem. Op. at 2, Appx5 ("In 2017, Wax co-authored an opinion essay in the Philadelphia Inquirer lamenting the loss of bourgeois culture while denigrating racial minorities.").

Regardless, even if one accepts Penn's characterization of Professor Wax's speech as derogatory toward African-Americans (*but see infra* at 31-32)—a characterization that is not only entirely irrelevant to her allegations that Penn maintains an unlawful, discriminatory speech policy but is likewise inappropriate on a motion to dismiss—the disciplinary actions against Professor Wax but not others for their statements critical of those of another race constitute discrimination "on the ground of race" and "on the basis of race" that is actionable under Title VI and Section 1981, respectively. The district court's determination to the contrary in granting Penn's motion to dismiss is reversible error.

### c.  Professor Wax also alleged viable claims under both Title VI and Section 1981 for retaliation.

Both Title VI and Section 1981 also prohibit retaliation for raising allegations of discrimination grounded in race or other protected characteristics. *See*

*Whitfield v. Notre Dame Middle Sch.*, 412 F. App'x 517, 522 (3d Cir. 2011) (unpublished) ("Title VI also supports a private cause of action for retaliation" (citing *Peters v. Jenney*, 327 F.3d 307, 320 (4th Cir.2003))); *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 451 (2008) (holding that Section 1981 "encompasses retaliation claims").

To establish a prima facie case of retaliation, a plaintiff must show (1) she engaged in protected opposition to discrimination; (2) she suffered a materially adverse action; and (3) that a causal connection exists between the protected activity and the adverse action. *See Watson v. Rozum*, 834 F.3d 417, 422 (3d Cir. 2016); *Williams v. Pennridge Sch. Dist.*, 782 F. App'x 120, 125 (3d Cir. 2019) (applying this standard to Title VI retaliation claim).[11]

"As in other civil rights contexts, to show 'protected activity,' a plaintiff asserting a Title VI [or Section 1981] retaliation claim need only prove she opposed an unlawful practice which [s]he reasonably believed had occurred or was occurring." *Ricketts v. Wake Cty. Pub. Sch. Sys.*, 125 F.4th 507, 524 (4th Cir. 2025) (cleaned up). That opposition "includes not only an employee's filing of formal charges of discrimination against an employer but also 'informal protests [against]

---

[11] This same standard applies to retaliation claims under Section 1981. *See Lei Ke v. Drexel Univ.*, 645 F. App'x 161, 165 (3d Cir. 2016) (applying the same test to retaliation claims under § 1981 and Title VI); *Katchur*, 354 F. Supp. 3d at 670 n.11 ("[T]he same framework generally governs retaliation claims under Title VI, Title IX, and Section 1981.").

discriminat[ion],'" perpetrated by that employer. *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015) (quoting *Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 135 (3d Cir. 2006)).

Moreover, it is well established that the civil rights statutes, including Title VI and Section 1981, allow suits by those, including employees, against whom adverse actions have been taken because they oppose race discrimination or engage in advocacy aimed at vindicating the rights of protected classes, even when they themselves are not the direct targets of the underlying discrimination. *See, e.g.*, *Whitfield*, 412 F. App'x at 522 ("Title VI also supports a private cause of action for retaliation" (citing *Peters,* 327 F.3d at 320)); *Kengerski v. Harper*, 6 F.4th 531, 537-38 (3d Cir. 2021) (concluding that white employee was protected from retaliation under Title VII when he reported his coworker's racist, anti-black comments); *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 512 (6th Cir. 2009) (recognizing claim for discrimination based on one's "advocacy on behalf of protected class members" (citing *Johnson v. University of Cincinnati*, 215 F.3d 561, 575 (6th Cir. 2000))). Indeed, in *Sullivan v. Little Hunting Park*, 396 U.S. 229, 237 (1969), the Supreme Court held that a white person who has been "punished for trying to vindicate the rights of minorities … has standing" to sue under section 1982, which parallels Section 1981.[12]

---

[12] The limitation on actions "with respect to any employment practice" contained in 42 U.S.C. § 2000d-3 does not bar Plaintiff's Title VI action. The Second Circuit

That is the theory pleaded here and never addressed by the district court.
Professor Wax properly alleged retaliation by asserting that "Penn's actions against
[her] were triggered by [her] speech on affirmative action and other comments in-
volving the topic of race and were intended to punish her for engaging in speech
Penn disfavored." Am. Compl. ¶ 145, Appx67. There is no doubt that Professor
Wax publicly opposed Penn's use of race-based affirmative action—a practice that
was later determined to be both unconstitutional and unlawful under Title VI, *see*

---

recently recognized that a "claim of retaliation for complaining about non-employ-
ment-related race discrimination is not an action 'with respect to any employment
practice'" within the meaning of Section 2000d-3's bar, even when the person com-
plaining about the non-employment-related race discrimination is an employee, and
even when the retaliation is an adverse employment action. *Bloomberg v. N.Y. City
Dep't of Educ.*, 119 F.4th 209, 210-11 (2d Cir. 2024). *Bloomberg* involved retaliation
against a public-school principal who had complained "that her students, predomi-
nantly of color, were victims of systemic race discrimination," yet the Second Circuit
held that the action was viable under Title VI and not barred by Section 2000d-3 even
though the plaintiff was an *employee*. *Id*. If actions such as those at issue in *Bloom-
berg* and by Penn here were instead held to be "with respect to any employment prac-
tice" exempt from Title VI because of Section 2000d-3, and not covered by Title VII
because the person retaliated against was not targeted *because of* her race or other pro-
tect characteristic, then a significant, unintended gap between the coverage of Title
VII and Title VI would be opened any time the whistleblower of Title VI violations
was also an "employee" in an unprotected class.

Likewise, if such a gap existed, claims such as the ones at issue in this case—namely,
that a university engaged in race-based discrimination against a professor based on the
racial content of that employee's speech—would not be actionable under either provi-
sion of the civil rights act and would go uncorrected and unpunished. That would be a
serious and perverse omission under the civil rights statutes. For this reason, Section
2000d-3 is best construed as allowing not just retaliation claims but also the type of
employee actions for discrimination under Title VI such as the one at issue here, that
are not cognizable under Title VII.

*Students for Fair Admissions,* 600 U.S. at 218-19. Likewise, as Penn's own disciplinary accusations make clear, Penn was not only aware of this opposition, but also took its adverse decision, at least in part, *because* of her views on the morality and legality of Penn's use of race-based admissions policies. Am. Compl. Ex. 4, Appx96. Those allegations, along with the reasonable inferences to be drawn from them, are all that is required to prove retaliation under Title VI and Section 1981 at the pleading stage.

A decision from the United States District Court for the District of Columbia involving a retaliation claim under Title VI is on all fours. Denying a motion to dismiss a Title VI claim by a professor at Gallaudet University, the court held:

> Although Kimmel's alleged protected activity is helping to assert minority students' rights under § 601 [of Title VI], rather than asserting her own personal right under the statute, under *Sullivan, see* 396 U.S. at 237, Kimmel's alleged advocacy on behalf of minority students is a protected activity sufficient to support a retaliation claim. Thus, at this early stage, with her allegations, Kimmel has stated a claim of retaliation under Title VI.

*Kimmel v. Gallaudet Univ.*, 639 F. Supp. 2d 34, 43 (D.D.C. 2009). So too in the Second Circuit. In a recent decision, that court held that a former principal of a public school had "a cognizable retaliation claim under Title VI" by alleging that she was subject to an investigation after filing a complaint "that her students, predominantly of color, were victims of systemic race discrimination." *Bloomberg*, 119 F.4th at 210. While the court did not directly address the issue, it was of no moment that the plaintiff did not share the race of the students for whom she was

advocating. *Id.* Instead, the Second Circuit explained that all she needed to allege was that "she engaged in protected activity, the DOE knew about her protected activity, she suffered an adverse action, and there was 'a causal connection between the protected activity and the adverse action.'" *Id.* (quoting *Papelino v. Albany Coll. of Pharm. of Union Univ.*, 633 F.3d 81, 91 (2d Cir. 2011)). Reflecting the fact that discrimination is still unlawful under Title VI whether perpetrated against one's own race or someone else's, there was no additional requirement that the plaintiff expose or oppose conduct that discriminates against the plaintiff's own race. As in *Kimmel* and *Bloomberg*, Professor Wax plausibly alleged retaliation under Title VI because she unquestionably engaged in the protected activity of opposing Penn's use of race-based affirmative action and other race-conscious policies and was subject to discipline because of that protected activity.

To the extent it addressed the retaliation issue at all, the district court was utterly dismissive of Professor Wax's claim, stating: "To characterize her comments as supportive of those she criticized and denigrated is not plausible." Mem. Op. 9, Appx12.

The district court's focus on whether Professor Wax's speech could be characterized as "denigrating" as opposed to "supportive" reflects a fundamental misapprehension of retaliation doctrine. Retaliation liability does not turn on whether opposition to unlawful conduct is polite or flattering; it turns on whether the plaintiff opposed conduct prohibited by the statute and was subjected to adverse action

because of that opposition. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173-74, 180 (2005); *Sullivan*, 396 U.S. at 237; *Curay-Cramer*, 450 F.3d at 135 ("When deciding whether a plaintiff has engaged in opposition conduct, we look to the message being conveyed rather than the means of conveyance."). As the Supreme Court has made clear, "[w]hen an employee communicates to her employer a belief that the employer has engaged in a form of [ ] discrimination, that communication virtually always constitutes the employee's *opposition* to the activity." *Crawford v. Metro. Gov't of Nashville & Davidson Cty.*, 555 U.S. 271, 276 (2009) (cleaned up). And opposition, even "informal protests [against] discriminat[ion]," is all that is needed under the first prong to validly allege a Title VI retaliation claim. *Curay-Cramer*, 450 F.3d at 135.

Here, even if Penn's characterization of Professor Wax's statements as "denigrating" to African Americans could be credited on a motion to dismiss, that still would not preclude any of the claims in this case, including retaliation, because her statements clearly constitute opposition to an "unlawful practice which [s]he reasonably believed had occurred or was occurring"—namely, Penn's use of race in admissions decisions. *Ricketts*, 125 F.4th at 524. Indeed, as noted above, the Supreme Court made clear that such a race-based admissions policy violates Title VI. *See Students for Fair Admissions*, 600 U.S. at 198 n.2, 230. And her statements about affirmative action criticized universities' affirmative action policies on the grounds that they intentionally discriminate against students on the basis of race

and often end up harming the very students they seek to assist—one of the very reasons such policies are unlawful. *Id.* Therefore, Professor Wax's speech criticizing affirmative action—on podcasts, in the classroom, and in her academic writing—can reasonably be read as *opposition* to Penn's Title VI violations and the harm it causes to the very racial minority students that it purportedly intends to benefit. That is especially so at the motion to dismiss stage, where courts must draw all reasonable inferences in plaintiff's favor. Penn's decision to discipline Professor Wax in part because of her affirmative action-related statements was thus retaliation against a protected activity no matter how "offensive" Penn judged her speech to be.

Moreover, her speech can also reasonably be viewed as supporting those students who are discriminated *against* by affirmative action—giving rise to the inference that she was retaliated against because of her association with a protected class. As noted, the Supreme Court has recognized that college admissions— "where students compete for a finite number of seats in each school's entering class"—is a zero-sum game. *Students for Fair Admissions*, 600 U.S. at 218; *id.* at 272 (Thomas, J., concurring). Even if Penn regards Professor Wax's comments protesting the award of an admission slot on the basis of race as "derogatory," the statement should also be read as advocating for students of other races who were denied admission as a result of race-based affirmative action. In other words, criticism of and support for affirmative action are two sides of the same coin.

Therefore, beyond misapplying the retaliation test, the district court was wrong to bar her retaliation claim because, in its view, "she did not support any protected class," since her comments did support the group of student applicants adversely affected by Penn's affirmative action policy, even if one credits the inference that her criticism of affirmative action somehow fails to "support" its intended beneficiaries.

In any event, whether Professor Wax's criticisms of affirmative action can plausibly be viewed as "denigrating" African Americans is hotly contested, and on a motion to dismiss, Penn's characterization of the comments as denigrating cannot be credited, in the face of the opposite characterization pleaded by Professor Wax. For example, Professor Wax's statement that she had not observed any African-American law student graduating in the top quartile of the class and "rarely in the top half," Amended Complaint ¶ 5, is a criticism of Penn's affirmative action programs and a reflection of the serious and well-documented scholarship by Wax and others that such programs create a mismatch between the academic credentials of the intended beneficiaries and their classmates, a mismatch that predictably results in lower grades and class standing for affirmative action admittees. Such a statement does not "denigrate" African American students but rather criticizes the program that places them at such a disadvantage. Professor Wax's comments plausibly constitute opposition to, and advocacy against, race-based decision-making that Title VI forbids and are therefore protected activity for which a retaliation claim is

31

viable.

In addition, it must be noted that whether Wax's statements can be considered "denigrating" to African Americans does not defeat her allegations of retaliation, or any of the claims that resulted from the race-based double standard in Penn's speech policy. To the contrary. Penn's application of the "denigration" criterion, as well as the district court's, is highly selective. Penn's academic free expression policies shield faculty who "denigrate" Jews and Israel, and even advocate for their eradication, whereas Wax's comments about African Americans characterized by Penn as "denigrating" receive no protection and are punished.

The district court's disregard of Professor Wax's well-pleaded retaliation allegations on a motion to dismiss is reversible error.

## II. The District Court Improperly Treated Penn's Disciplinary Accusations as True on a Rule 12(b)(6) Motion.

The district court dismissed Professor Wax's claims only by crediting the truth of Penn's disciplinary accusations, rather than Professor Wax's well-pleaded allegations denying them, contesting their accuracy, or taking issue with Penn's characterizations and descriptions of her statements. After noting that Penn's charging document and the Hearing Board report were "attached and integral" to the Amended Complaint, the court treated Penn's characterizations as established fact, describing Professor Wax as having "a record of derogatory and discriminatory statements to and about members of the university community," and stating

that she "was sanctioned for harmful speech directed at specific demographics in the University." Mem. Op. 6, 11, 13, Appx9, 14, 16.

These are not allegations pleaded by Professor Wax; they are Penn's contested conclusions, drawn directly from the disciplinary materials Professor Wax attached to her complaint solely to show the basis of the charges against her—not to concede their truth. Indeed, the Amended Complaint specifically denied the accuracy of the statements that Penn has attributed to Professor Wax, accusing Penn of suspending her based on comments that "were in many cases lifted out of context and simply misrepresented." Am. Compl. ¶ 53, Appx43; *see also id.* ¶¶ 74, 118, Appx51, 63. The Amended Complaint further denied the accuracy of findings made by Penn's Hearing Board about her alleged statements and contested the Hearing Board's report as having "credited uncorroborated claims, and omitted key facts and timelines." *Id.* ¶¶ 53, 72, Appx43, 47-48. At the pleading stage, the Court must accept as true the Amended Complaint's explicit assertions that these allegations are false and misleading.

Nonetheless, the district court relied on those Penn-authored findings to reject Wax's comparator allegations, assess plausibility, and ultimately dismiss her claims at the pleading stage. Mem. Op. 10-12, Appx13-15. From the very first page, the district court framed the case as requiring it "to determine whether offensive comments directed at racial minorities are protected by [anti-discrimination] laws." Mem. Op. at 1, Appx4. The district court then listed a variety of statements

33

that Penn attributed to Professor Wax, *id.* at 2-3, Appx5-6, before concluding that Wax had not pleaded a racial double standard because the comparators she cited "did not speak about race as she did," *id.* 11-12, Appx14-15. The court then adopted Penn's disputed and unsupported conclusion that Professor Wax had "a record of derogatory and discriminatory statements to and about members of the university community." *Id.* at 13, Appx16. In doing so, the court resolved disputed facts against the plaintiff and treated a defendant's disciplinary narrative as binding admissions, which are precisely the errors this Court has condemned. In *Doe v. Princeton University*, this Court held that although a district court may consider documents "integral to or explicitly relied upon in the complaint," that authority "only goes so far." 30 F.4th 335, 342 (3d Cir. 2022). "When the truth of facts in an 'integral' document are (sic) contested by the well-pleaded facts of a complaint, the facts in the complaint must prevail." *Id.* at 342.

This Court recently reaffirmed this principle in *Rivera v. New Castle County Police Department*, holding that even when documents are judicially noticed, a court must still determine whether relief is plausible under the plaintiff's version of the facts, "even when facts in judicially noticed documents conflict with those in the complaint." 152 F.4th 147, 153 (3d Cir. 2025) (citing *Doe*, 30 F.4th at 342). In *Rivera*, the district court erred by accepting the contents of police documents to determine the plaintiff's knowledge, effectively resolving a factual dispute at the motion-to-dismiss stage. *Id.* at 152-53.

34

The district court here committed the same error, a point reinforced by the very persuasive authority this Court relied upon in *Doe*. In *Doe*, this Court cited *Otis v. Demarasse*, 886 F.3d 639 (7th Cir. 2018), to demonstrate that "[o]ther circuit courts agree" that crediting the content of an attached document over a plaintiff's denial is reversible error. *Doe*, 30 F.4th at 344 n.11.

Although *Otis* is a Seventh Circuit decision, its facts are directly analogous to the case at bar. In *Otis*, the plaintiff attached a police report that contradicted her allegations; the district court nevertheless accepted the report as true and dismissed the case. *Otis*, 886 F.3d at 646–47. The Seventh Circuit reversed, warning that "rather than accepting [as true] every word in a unilateral writing by a defendant and attached by a plaintiff to a complaint," the court must consider why the plaintiff attached the document. *Id*. at 647. The court held that "[a] plaintiff does not, simply by attaching documents to his complaint, make them a part of the complaint and therefore a basis for finding that he has pleaded himself out of court." *Id*.

Here, Professor Wax attached the disciplinary records to demonstrate the discriminatory nature of the charges, not to validate Penn's findings. Many of those charges were vigorously contested not only before the Penn hearing board that imposed discipline on Wax, but in the court below. By crediting Penn's version of events over Professor Wax's well-pleaded allegations, the district court's dismissal cannot stand and must be reversed.

## CONCLUSION

The district court's dismissal of Professor Wax's claims under Title VI and Section 1981 failed to address the language in those statutes that is materially different, and broader, than the language in Title VII on which it relied to dismiss all three claims. It also credited Penn's characterization of hotly disputed facts and conclusory allegations merely because they were contained in the disciplinary reports *prepared by Penn* that were attached to Professor Wax's complaint as exhibits demonstrating the actions taken against her, not as admissions for the truth of the matters Penn asserted therein. By so doing, the district court failed to accept Professor Wax's well-pled allegations as true, as it was obligated to do on a motion to dismiss.

For both reasons, the decision of the district court should be reversed.

January 15, 2026                          Respectfully submitted,

                                         */s/ Alexander Haberbush*
                                         Alexander Haberbush
                                         CONSTITUTIONAL COUNSEL GROUP
                                         444 W Ocean Blvd. Suite 1403
                                         Long Beach, CA 90802
                                         Tel. (562) 435-9062

                                         Jason B. Torchinsky
                                         Kellen S. Dwyer
                                         HOLTZMAN VOGEL BARAN
                                         TORCHINSKY & JOSEFIAK PLLC
                                         2300 N Street NW Suite 643
                                         Washington, D.C. 20037
                                         Tel. (202) 737-8808

# COMBINED CERTIFICATIONS

1. I, Alexander Haberbush, hereby certify, pursuant to Local Rules 28.3(d) and 46.1(e), that I was duly admitted to the Bar of the United States Court of Appeals for the Third Circuit in 2025 and am presently a member in good standing at the Bar of said court.

2. This brief complies with the type-volume requirements and limitations of Fed. R. App. P. 32(a). Specifically, this brief contains 9,250 words in 14-point Times New Roman font.

3. This brief complies with L.A.R. 31.0(c) because the text of the electronic brief is identical to the text in the paper copies.

4. This brief complies with L.A.R. 31.0(c) because the virus detection program Microsoft Defender, version 1.443.689.0, has been run on the file and no virus was detected.

January 15, 2026                                       */s/ Alexander Haberbush*
                                                          Alexander Haberbush

## CERTIFICATE OF SERVICE

I, Alexander Haberbush, counsel for Appellant Amy Wax, and a member of the Bar of this Court, hereby certify that, on January 15, 2026, an electronic copy Appellant's Opening Brief, together with Appendix Volume I, was filed with the Clerk of Court using the CM/ECF System. I further certify that all parties required to be served have been served.

January 15, 2026                              */s/ Alexander Haberbush*
                                             Alexander Haberbush

No. 25-2888

# In the United States Court of Appeals
# for the Third Circuit

---

AMY WAX,

*Appellant*,

v.

THE TRUSTEES OF THE
UNIVERSITY OF PENNSYLVANIA,

*Appellee*,

---

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(The Honorable Timothy J. Savage)
(No. 2:25-CV-00269)

---

**JOINT APPENDIX**

**(Volume 1, pp. 1 - 19)**

---

Kellen S. Dwyer
Jason B. Torchinsky
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
2300 N Street NW Suite 643
Washington, D.C. 20037
Tel. (202) 737-8808

Alexander Haberbush
CONSTITUTIONAL COUNSEL GROUP
444 W Ocean Blvd. Suite 1403
Long Beach, CA 90802
Tel. (562) 435-9062

# TABLE OF CONTENTS

| D. Ct. ECF # | Document | Pages |
|---|---|---|
| | **Volume 1** | |
| 57 | Notice of Appeal (September 26, 2025) | Appx1 |
| 56 | Order of Dismissal (August 28, 2025) | Appx3 |
| 55 | Memorandum Opinion (August 28, 2025) | Appx4 |
| | **Volume 2** | |
| | Docket Sheet | Appx20 |
| 22 | Amended Complaint (March 3, 2025) | Appx28 |
| 22-1 | Amended Complaint Exhibits | Appx80 |
| | Ex. 1 – Penn Faculty Handbook § II.E.12: Academic Freedom at Penn. | Appx83 |
| | Ex. 2 - Penn Faculty Handbook § II.E.16: Procedure Governing Sanctions Taken Against Members of the Faculty. | Appx88 |
| | Ex. 3 - Penn Faculty Handbook § II.A: Senate Committee on Academic Freedom and Responsibility. | Appx92 |
| | Ex. 4 - Charging Document of Dean Ted Ruger | Appx93 |
| | Ex. 5 - Letter of AGC Burke (July 29, 2022) | Appx103 |
| | Ex. 6 - Final Hearing Board Report (June 21, 2023) | Appx105 |
| | Ex. 7 - University of Pennsylvania Office of General Counsel Hearing in re: Amy L. Wax Transcript Excerpts | Appx113 |

i

| | | |
|---|---|---|
| | Ex. 8 - Decision of the President In the Matter of Professor Amy Wax (August 11, 2023) | Appx130 |
| | Ex. 9 - Senate Committee on Academic Freedom and Responsibility Report (May 29, 2024) | Appx144 |
| | Ex. 10 - Final Provost Jackson Letter to Wax (September 23, 2024) | Appx146 |
| | Ex. 11 - Publication of Sanctions against Professor Wax Online | Appx148 |
| | Ex. 12 - Letter of Jules van Binsbergen | Appx152 |
| | Ex. 13 - Tenure Appointment Letter (July 1, 2001) | Appx158 |
| | Ex. 14 - University of Pennsylvania's Open Expression Policy (Retrieved from Penn Website) | Appx160 |
| | Ex. 15 - President Magill's Submitted Testimony to Congress | Appx166 |
| | Ex. 16 - Counsel for Plaintiff Wax Letter to Penn: "A Reasonable Accommodation of a Postponement of These Proceedings." Memorandum of August 31, 2022 | Appx171 |
| 26-3 | Motion to Dismiss, Exhibit A: The University of Pennsylvania Faculty Handbook, generated August 1, 2024 | Appx230 |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

AMY WAX,

                                **Plaintiff,**

        v.                                              No. 2:25-cv-00269-TJS

THE TRUSTEES OF THE UNIVERSITY OF
PENNSYLVANIA,

                                **Defendants.**

## NOTICE OF APPEAL

Please take notice that Plaintiff, Professor Amy Wax, hereby appeals to the United States

Court of Appeals for the Third Circuit from the attached Memorandum Opinion (Doc. 55) and

Order (Doc. 56) entered August 28, 2025, which granted Defendants' Motion to Dismiss Plaintiff's

Amended Complaint.

Dated: September 26, 2025                    Respectfully submitted,

                                            /s/ *Samantha K. Harris*
                                            Samantha K. Harris
        Jason B. Torchinsky*                PA Bar No. 90268
        D.C. Bar No. 976033                 ALLEN HARRIS PLLC
        Kellen S. Dwyer*                     P.O. Box 673
        D.C. Bar No. 1008151                 Narberth, PA 19072
        HOLTZMAN VOGEL BARAN                 sharris@allenharrislaw.com
        TORCHINSKY & JOSEFIAK               Phone: (610) 634-8258
        2300 N Street NW, Suite 643
        Washington, D.C. 20037
        jtorchinsky@holtzmanvogel.com       Susan Greene*
        kdwyer@holtzmanvogel.com            NY Bar No. 4687349
        Phone: (202) 737-8808               HOLTZMAN VOGEL BARAN
                                            TORCHINSKY & JOSEFIAK
                                            5360 Genesee Street, Suite 203
        *Attorneys for Plaintiff Professor Amy Wax*   Buffalo, NY 14026
                                            sgreene@holtzmanvogel.com
        *  pro hac vice*                    Phone: (716) 647-6103

Appx1

**CERTIFICATE OF SERVICE**

I hereby certify that on this 26th day of September, 2025, a true and correct copy of the foregoing was electronically filed and is available for viewing and downloading from the Court's CM/ECF system, which will send a notice of electronic filing to all counsel of record.

*/s/ Samantha K. Harris*
Samantha K. Harris

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **AMY WAX** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **THE TRUSTEES OF THE UNIVERSITY** | : | |
| **OF PENNSYLVANIA** | : | |
| | : | **NO. 25-269** |

### ORDER

**NOW**, this 27th day of August, 2025, upon consideration of Defendants' Motion to Dismiss Plaintiff's Complaint (Doc. No. 26), the plaintiff's response, and the defendants' reply, it is **ORDERED** that the motion is **GRANTED**.

**IT IS FURTHER ORDERED** as follows:

1.    Counts II, III and V of plaintiff's Amended Complaint are **DISMISSED WITH PREJUDICE.**

2.    Counts I and IV of plaintiff's Amended Complaint are **DISMISSED WITHOUT PREJUDICE.**

_____
TIMOTHY J. SAVAGE, J.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **AMY WAX** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **THE TRUSTEES OF THE UNIVERSITY** | : | |
| **OF PENNSYLVANIA** | : | |
| | : | **NO. 25-269** |

### MEMORANDUM OPINION

**Savage, J.**                                                          **August 27, 2025**

After she was disciplined for "flagrant unprofessional conduct" based on statements she had made in class and in public that demeaned and denigrated racial minorities, Amy Wax, a tenured professor at University of Pennsylvania Carey School of Law, brought this action against the Board of Trustees of the University of Pennsylvania ("Penn"). She asserts that Penn discriminated against her based on the content of her speech and her status as a White Jewish woman. She brings federal claims for race discrimination and state law claims for breach of contract and false light invasion of privacy.

As much as Wax would like otherwise, this case is not a First Amendment case. It is a discrimination case brought under federal antidiscrimination laws. It calls for us to determine whether offensive comments directed at racial minorities are protected by those laws.

Having considered Penn's motion to dismiss the Amended Complaint for failure to state a cause of action, we conclude Wax has failed to allege facts that show that her race was a factor in the disciplinary process and there is no cause of action under federal antidiscrimination statutes based on the content of her speech. Thus, we will dismiss the

Appx4

federal discrimination claims and decline to exercise supplemental jurisdiction over her state law claims.

## Background[1]

Wax began her career at Penn Carey Law School as a tenured professor on July 1, 2001.[2]  Five years later, she was named the Robert Mundheim Professor of Law.[3]

In 2017, Wax co-authored an opinion essay in the *Philadelphia Inquirer* lamenting the loss of bourgeois culture while denigrating racial minorities.[4]  This instigated student and faculty complaints against Wax for statements she made in the article and later for statements she made in the following years.

On March 2, 2022, Dean Theodore W. Ruger sent Wax a letter charging she had "shown a callous and flagrant disregard for [the] University community" and inviting an informal resolution.[5]  The letter cited the following as examples of her conduct:

- When asked by a Black student if she agreed with the claim that Black people are inherently inferior to white people, Wax responded: "You can have two plants that grow under the same conditions, and one will just grow higher than the other."
- Wax asserted on a panel that "our country will be better off with more whites and fewer nonwhites."
- Wax told the New Yorker that "women, on average, are less knowledgeable than men" and "less intellectual than men."
- Wax publicly described Black people as having "different average IQs" than people of other races, such that "Blacks are not going to be evenly distributed throughout all occupations" and that this phenomenon is "not due to racism."
- Wax asserted that "the United States is better off with fewer Asians" and that Asian people lack "thoughtful and audacious individualism."
- Wax told a Black colleague that it is "rational to be afraid of Black men in elevators."
- Wax, speaking on a panel with a gay colleague, asserted that "no one should have to live in a dorm room with a gay roommate," and separately stated that same-sex relationships are selfish and not focused on family or community.
- Wax stated on a podcast that she "often chuckle[s]" at advertisements that show interracial marriages because "[t]hey never show blacks the way they really are: a bunch of single moms with a bunch of guys who float in and out. Kids by different men."

- In an appearance on Tucker Carlson Today, Wax asserted that "Blacks" and other "non-Western groups" harbor "resentment, shame and envy" against Western people for their "outsized achievements and contributions even though, on some level, their country is a shithole."[6]

On June 23, 2022, after attempts at informal resolution had failed, Dean Ruger requested the Chair of the Faculty Senate to convene a Hearing Board. The Chair began assigning faculty members to the Hearing Board in June 2022.[7]

After faculty members were assigned, Wax filed motions to disqualify all members. Before filing the motions, she requested information about the Hearing Board members, including whether they had attended a presentation by Professor Anita L. Allen on February 16, 2022, where the University's speech standards were discussed.[8] Penn denied the request.[9] The composition of the Hearing Board was finalized on September 13 when Wax's motions to disqualify its members were denied.[10]

The Hearing Board conducted a three-day hearing from May 1 to May 3, 2023.[11] On June 21, 2023, the Hearing Board published its report, finding Wax had engaged in "flagrant unprofessional conduct."[12] The Board found that she was in dereliction of her scholarly responsibilities, had violated privacy policies, and had not treated students with equitable due respect.[13] The Board recommended a one-year suspension at half pay, loss of the named chair, loss of summer pay in perpetuity, and a public reprimand.[14]

The Hearing Board sent its report to then-President Liz Magill on June 21, 2023.[15] Magill issued her decision upholding the proposed sanctions on August 11, 2023.[16] On September 24, 2023, Interim President J. Larry Jameson published Magill's decision on Penn's website.[17]

Wax appealed to the Faculty Senate Committee on Academic Freedom and Responsibility ("SCAFR").[18]   On May 29, 2024, SCAFR issued its report, finding no procedural defects.[19]

On May 30, 2024, Provost John Jackson sent Wax a draft reprimand, advising her that he would release it later that day.[20]   At Wax's request, Interim President Jameson met with her.[21]   As a result of that meeting, attorneys for Penn and Wax engaged in settlement negotiations, which ultimately failed.[22]

On September 23, 2024, in accordance with the sanctions, Provost Jackson sent a letter to Wax as a "public reprimand" and notified her that he intended to impose the sanctions recommended by the Hearing Board.[23]   Penn published the formal reprimand and publicized the sanctions that same day in its online campus newspaper.[24]

The following day, Jameson published the SCAFR Report on Penn's website.[25]   SCAFR member Jules van Binsbergen wrote a dissenting report, arguing that the procedure "did not appropriately protect" Wax's rights.[26]

Penn Carey Law School Dean Sophia Lee advised Wax that Penn was imposing the sanctions, including loss of her named chair, a one-year suspension at half pay with benefits intact, and loss of summer pay in perpetuity.[27]   Because Wax had already commenced teaching, including a year-long seminar, for the 2024-2025 academic year, the one-year suspension was delayed until July 1, 2025.[28]

Wax brought this action for race discrimination under Title VI, Title VII and Section 1981 of the Civil Rights Act, and breach of contract and false light invasion of privacy under Pennsylvania law.[29]   She withdrew a cause of action under the Americans with Disabilities Act.

**Standard of Review**

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

A conclusory recitation of the elements of a cause of action is not sufficient. *Oakwood Lab'ys LLC v. Thanoo,* 999 F.3d 892, 904 (3d Cir. 2021). The plaintiff must allege facts necessary to make out each element. *Id.* (quoting *Iqbal*, 556 U.S. at 669, 679). In other words, the complaint must contain facts which support a conclusion that a cause of action can be established.

In considering a motion to dismiss under Rule 12(b)(6), we first separate the factual and legal elements of a claim, accepting the well-pleaded facts as true and disregarding legal conclusions. Then, we determine whether the alleged facts make out a plausible claim for relief. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210–11 (3d Cir. 2009) (quoting *Iqbal*, 556 U.S. at 679). All well-pleaded allegations in the complaint are accepted as true and interpreted in the light most favorable to the plaintiff, and all inferences are drawn in the plaintiff's favor. *See McTernan v. City of York*, 577 F.3d 521, 526 (3d Cir. 2009) (quoting *Schrob v. Catterson*, 948 F.2d 1402, 1408 (3d Cir. 1991)).

In deciding a motion to dismiss, courts generally consider only the allegations of the complaint, exhibits attached to the complaint, documents incorporated by reference in the complaint, and matters of public record. *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 134 (3d Cir. 2004) (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d

1410, 1420, 1426 (3d Cir. 1997)); *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.,* 998 F.2d 1192, 1196 (3d Cir. 1993) (citations omitted).

Because Dean Ruger's charging document and the Hearing Board's report are attached and integral to Wax's amended complaint, we may consider the exhibits without converting the motion to dismiss to a motion for summary judgment.

## Analysis

*Discrimination – (Counts II, III, V – Section 1981, Title VI, Title VII)*

Wax proffers two theories of race discrimination. First, she claims that she was discriminated against based on the racial content of her speech. She argues she was disciplined for what she said about some races while others who spoke negatively about other races were not disciplined. Essentially, she is asserting a race discrimination claim based on the content of her speech. Second, she alleges that she was disciplined because of her status as a White, Jewish woman.

The anti-discrimination statutes protect speakers, not speech. They forbid discrimination based on the race of the speakers, not the racial content of their speech.

Section 1981 of the Civil Rights Act states: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981(a).

Title VI states: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be

subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000(d).

Title VII provides that "[i]t shall be an unlawful employment practice for an employer— (1) to … discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

To support her first theory, Wax claims that Penn punishes some speakers for the racial content of their speech but does not punish other speakers who engage in speech of the same or materially similar content depending on the race of the subject of the speech.[30]  Specifically, she claims that anti-Jewish speech is not subject to discipline while speech directed at other racial groups is.[31]

To make out claims under Section 1981, Title VI, and Title VII, Wax must plausibly allege that she was subjected to intentional discrimination because of her race.  Alleging that one was discriminated against because of one's own protected characteristic (race) is an essential element of a race discrimination claim.  Federal antidiscrimination law does not provide a cause of action for disparate treatment of speech conduct.  In other words, it is the speaker, not the speech, that is protected.

Both parties rely upon *Frith v. Whole Foods Market, Inc. (Frith I)* to support their arguments.  517 F. Supp. 3d 60 (D. Mass. Feb. 5, 2021).  In that case, employees at Whole Foods alleged their employer was discriminating against them by disciplining them for wearing BLM masks while employees wearing apparel with other messages were not disciplined. The district court dismissed the claim, concluding plaintiffs' allegations amounted to content-based speech discrimination, which does not support a Title VII

claim. *Frith*, 517 F. Supp. 3d at 71. As the district court pointed out, the Supreme Court had recently "reinforced what the plain language of the statute makes clear: that the proper focus [of a discrimination claim] is on the protected characteristic of the individual employee bringing the claim." *Id.* (citing *Bostock v. Clayton Cnty.*, 590 U.S. 644, 658 (2020)).

The First Circuit affirmed with slightly different reasoning. It reiterated that in a discrimination case, "the proper focus is on the protected characteristic of the individual plaintiff." *Frith v. Whole Foods Market, Inc. (Frith II),* 38 F. 4th 263, 271 (1st Cir. 2022) (citing *Bostock*, 590 U.S. at 658). After settling that threshold issue, the appeals court considered whether the plaintiffs had properly pleaded discrimination based on their status as Black employees, their advocacy for Black employees, and their association with Black employees. *Id.* at 273. In its discussion, the court made the statement, relied on by Wax, that "[u]nlike the district court … [plaintiffs] have pleaded discrimination claims that are, conceptually, consistent with Title VII." *Id.* at 274. Wax interprets this statement to mean a Title VII claim can be based on the racial content of speech instead of the race of the speaker.[32] She is wrong.

The *Frith II* court's statement explained that plaintiffs had either pleaded discrimination based on their race as Black employees or their association with Black employees. "Unlike the district court, then, we do not think that appellants have failed to allege that the race of the individual plaintiffs was a motivation for the discrimination … It is clear from the complaint that appellants all fall into one of two categories, Black employees who are subject to racial discrimination and non-Black employees who are subject to racial discrimination [by association]." *Id.* In other words, the plaintiffs had

pleaded discrimination based on the race of the speakers, not the racial content of their speech. *Frith* did not hold, as Wax contends, that a Title VII claim need not be based on the plaintiff's own protected characteristic.

Wax misconstrues *Frith II* again when she claims it supports her novel theory for a speech-based discrimination claim. She relies on the *Frith II* court's statement that it did not think "the fact that both Black and non-Black employees were disciplined for wearing Black Lives Matter masks undercuts the discrimination claim."[33] The court elaborated that the plaintiffs had alleged race was a factor because they had pleaded an associational race discrimination claim based on their association with Black people through their messaging. It did not hold that the speech content formed the basis of a discrimination claim under Title VII. *Id.* at 271. Neither do we.

Wax does not allege facts showing that she was discriminated against because she was speaking on behalf of any protected class. She did not associate with any person or persons who were in a protected class. She did not support any protected class. To characterize her comments as supportive of those she criticized and denigrated is not plausible.[34]

Wax's second theory is that her own race as a White, Jewish woman was a motivating factor in Penn's decision to discipline her. She claims that Penn's disciplinary action occurred under circumstances giving rise to an inference of intentional discrimination.[35] She baldly claims that Penn's speech policy[36] "discriminates based on the race or other ground of the speaker,"[37] and that anti-Jewish speech is not subject to discipline.[38] She alleges this policy creates a racially hostile environment and that Penn chose not to punish antisemitic speech or prevent a racially hostile environment, which

"contributed to the violation of" her Section 1981 rights.[39]  She claims, without any factual

support, that her race was a but-for cause of her discipline.[40]

Upon a closer look, her claim that Penn discriminated against her based on her

race is based on the same argument she made about the content of her speech.  She

expressly claims that Penn treats the content of antisemitic speech differently than her

speech.  Again, she focuses on the content of speech, not the speaker.  She defines

Penn's speech policy as allowing some races to be criticized and others not.  That clearly

goes to speech content.

Wax's amended complaint could not be clearer.  At paragraph 145, she frames her

discrimination claim, stating "Penn's actions against [Professor] Wax were triggered by

Professor Wax's speech on affirmative action and other comments involving the topic of

race and were intended to punish her for engaging in speech Penn disfavored.  At the

same time, Penn did not punish any antisemitic speech."[41]  So, she alleges, the discipline

"was directly caused by Penn's racially discriminatory Speech Policy."[42]

Wax alleges no direct evidence of discrimination based on her race.  Neither does

she allege any facts about the disciplinary proceedings that raise an inference of

discrimination.  Her claim of discrimination rests on comparing what she said to what

others at Penn said who were not disciplined.  In sum, her allegations center on the

absence of discipline for speech Wax deems antisemitic as compared to her speech for

which she was disciplined.

In the absence of direct evidence, her discrimination claim rests on an inference

of racial discrimination based on comparator evidence.  To survive a motion to dismiss,

"[the plaintiff] must allege facts sufficient to make plausible the existence of ... similarly

situated parties." *Danao v. ABM Janitorial Servs.*, 142 F. Supp. 3d 363, 375 (E.D. Pa. Oct. 7, 2015) (quoting *Perano v. Twp. of Tilden*, 423 Fed. Appx. 234, 238 (3d Cir. 2011)). A similarly situated party is one whose employment situation is nearly identical to that of the plaintiff, *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 170 (3d Cir. 2013), and who engaged in similar misconduct. *Wilcher v. Postmaster Gen.*, 441 F. Appx 879, 882 (3d Cir. 2011); *Opsatnik v. Norfolk S. Corp.*, 355 F. Appx 220, 223 (3d Cir. 2009).

Penn argues that the persons cited in the Amended Complaint are not comparators. It identifies them as employees in schools other than the law school. This, Penn argues, disqualifies them as comparators.

Penn's comparator argument is not persuasive. The disciplinary policy applies to all university faculty. The handbook is a university policy and dictates the university-wide disciplinary process. The Hearing Board is comprised of faculty from the university applying the same standards to all Penn faculty. Thus, comparators are faculty throughout the university, not only in the law school.

Wax's discrimination claim fails for a different reason. The seven persons she identifies as having been treated differently are not comparators. The content of their speech is not comparable to the speech for which she was sanctioned. They did not speak about race as she did. All but one commented on political issues surrounding the Israeli-Hamas conflict, which she characterizes as antisemitic. She was sanctioned for harmful speech directed at specific demographics in the University. The remarks of her purported comparators were not antisemitic; they were critical of Israel's treatment of Palestinians.

The seven persons Wax claims are comparators are: (1) Dwayne Booth, a non-tenured lecturer who posted an allegedly antisemitic cartoon;[43]  (2) Ahmad Almallah, a Palestinian poet and artist-in-residence who lectures at Penn and participated in a rally;[44] (3) Julia Alekseyeva, a professor at Penn who posted on social media about the murder of Brian Thompson;[45]  (4) Anne Norton, a Penn professor who posted a comment about Hamas and a comment about Jews on social media;[46] (5) Huda Fakhreddine, an associate professor at Penn, who made a statement in support of Hamas and teaches a course that touches on Palestine;[47] (6) Jill Richards, a Penn librarian who made a Facebook post in support of Hamas;[48] and (7) Ibrahim Kobeissi, a Penn Health employee who commented on the Israel/Gaza conflict.[49]

Some of these statements may have been unprofessional and potentially offensive.  That is not the issue.  Wax must show much more than a potentially offensive statement.  She must show that the individuals who made the statements are similarly situated both in terms of the severity of their conduct and their employment conditions. *See Mandel*, 706 F.3d at 170; *Wilcher*, 441 F. Appx at 882; *Opsatnik,* 355 F. Appx at 223.

As is apparent from Wax's allegations and what she did not allege, the purported comparators are not comparators.  She did not allege any of them made more than two harmful statements.  *See Wilcher*, 441 F. Appx at 882.  She did not allege they made statements about the law school or even the wider University community.  All of the comments in her complaint had to do with current events.  None of the alleged comparators had a pattern of making denigrating and derogatory statements about minorities.  Wax also does not identify the race of the alleged comparators, except Almallah, a Palestinian who participated in a rally in support of Palestine.  They do not

compare to Wax, a tenured law professor with a record of derogatory and discriminatory statements to and about members of the university community, who was given warnings and on whom lesser disciplinary measures were imposed before she was subjected to disciplinary proceedings.[50]

Other than the allegations relating to purported comparators, Wax includes no other factual assertions supporting her claim that she was disciplined because she was White and Jewish. There are no factual allegations in her complaint showing that her race was part of her disciplinary hearing or appeal or that it had anything to do with bringing the charges against her.  Without them, her claim that her status as a White, Jewish woman was a cause of her discipline is conclusory.  *See Oakwood Lab'ys LLC,* 999 F.3d at 904 (quoting *Iqbal*, 556 U.S. at 669, 679).  As she alleges, Penn initiated disciplinary proceedings against her because of the content of her speech,[51] not her race.  Having failed to allege facts from which one could reasonably infer that she was treated differently than other faculty members on the basis of her race, the claim that she was discriminated against is an unsupported conclusion.

In sum, her allegations, accepted as true, do not pass the plausibility test. Conclusory statements are not substitutes for facts. Subjective beliefs are not facts.

Wax now asserts an associational discrimination claim when she asks us to read her comments disparaging Black students as a statement on behalf of a protected class, – racial groups harmed by Penn's affirmative action policies – for which she is being discriminated against.[52]  This is not a plausible interpretation of her comments.  Nothing in the disciplinary process or her comments leads to the conclusion that she was penalized for associating with a protected class.  Her comments were not advocacy for

protected classes.  They were negative and directed at protected classes.  Criticizing minorities does not equate to advocacy for them or for White people.  Her claim that criticism of minorities was a form of advocating for them is implausible.

Wax has not stated a plausible cause of action that she was discriminated against based on her race.  Therefore, we will grant Penn's motion to dismiss Wax's discrimination claims under Section 1981, Title VII, and Title VI.

*State Law Claims*

"Where the claim over which the district court has original jurisdiction is dismissed before trial, the district court *must* decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so."  *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000) (emphasis in original) (citing *Borough of West Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995)); 28 U.S.C. § 1367(c)(3).

Contrary to Wax's assertion,[53] there is no federal issue implicated here.[54]  Having dismissed her federal claims, we decline to exercise supplemental jurisdiction over the state law breach of contract and false light invasion of privacy claims.

Where the complaint does not withstand a 12(b)(6) motion, a curative amendment must be allowed unless amendment would be inequitable or futile.  *Alston v. Parker*, 363 F.3d 229, 235 (3d. Cir. 2004).  An amendment is futile if the proposed amendment would still fail to state a claim upon which relief can be granted.  *Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997)).  There is nothing Wax can add that would make her discrimination

claims plausible.  Thus, because amendment would be futile, Wax will not be given leave
to amend her complaint once again.

[1] The facts are recited from the allegations in the Amended Complaint. We accept them as true
and draw all reasonable inferences from them in favor of Wax.  We also consider documents attached to
the Amended Complaint.

[2] Am. Compl. ¶ 37, ECF No. 22 ["Compl."].

[3] *Id.* ¶ 38.

[4] *Id.* ¶ 39.

[5] *Id.* ¶ 52; Charging Document of Dean Ruger 11, ECF No. 22-1 (attached as Ex. 4 to Compl.).

[6] Charging Document of Dean Ruger.

[7] Compl. ¶ 61.

[8] *Id.* ¶ 63.

[9] *Id.* ¶ 65.

[10] *Id.* ¶ 66.

[11] *Id.* ¶ 67.  At oral argument, plaintiff's counsel could not say what reasons were given in her
motions.

[12] Hearing Board Report, ECF No. 22-1 (attached as Ex. 6 to Compl.).

[13] *Id.*

[14] Compl. ¶ 68.

[15] *Id.* ¶ 69.

[16] *Id.* ¶ 75.

[17] *Id.* ¶ 77.

[18] *Id.* ¶ 78.

[19] *Id.* ¶ 79.

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] *Id.* ¶ 80.

[24] *Id.* ¶ 81.

[25] *Id.* ¶ 82.

[26] *Id.* ¶ 84.

[27] *Id.* ¶ 82.

[28] *Id.*

[29] She also brought a claim under the ADA for failure to reasonably accommodate.  She voluntarily
dismissed that claim.  25-cv-269, Plaintiff's Notice of Voluntary Dismissal with Prejudice as to Certain Claim
(ECF No. 30), March 20, 2025.

[30] *Id.* ¶ 136.

[31] *Id.* ¶ 138.

[32] Pl.'s Br. at 26.

[33] *Id.*

[34] Some of the comments are set forth in the charging letter attached as Ex. 4 to the Amended Complaint.

[35] Compl. ¶¶ 133, 154, 176.

[36] *Id.* ¶ 7.  Wax alleges Penn has a "Speech Policy."  She defines the policy as a collection of policies that provide that "some races may not be criticized while other racial or ethnic groups can be – and routinely are – subjected to virulently racist speech without consequence."  *Id.*  She has not pointed to any written or official "Speech Policy" at Penn, much less one that condones discrimination, despite her attempts to turn her conclusory assertion into a factual allegation by presenting it as such.

[37] *Id.* ¶ 137.

[38] *Id.* ¶ 138.  Her complaint states that anti-Jewish speech is not subject to the same discipline under the Speech Policy as speech alleged to target other racial groups.  She does not include other examples of "speech alleged to target other racial groups."  The only example of speech about racial groups other than Jews is her own.

[39] *Id.* ¶¶ 139, 141-42.

[40] *Id.* ¶ 146.

[41] *Id.* ¶ 145.

[42] *Id.* ¶ 147.

[43] *Id.* ¶¶ 9-10.

[44] *Id.* ¶ 17.

[45] *Id.* ¶ 20.

[46] *Id.* ¶ 90.

[47] *Id.* ¶¶ 94-95.

[48] *Id.* ¶ 101.

[49] *Id.* ¶ 102.

She also points to an "encampment" of protestors at Penn.  It is unclear how an encampment of unnamed individuals holding a protest are comparators to Wax.  Regardless, she concedes that 33 protestors were arrested and the encampment was disbanded, *id.* ¶¶ 88-89, casting doubt on her assertion that the alleged comparators in the group were not disciplined.  She lists as a comparator a "crowd of Penn faculty and students [who] gathered to call for an attack against Tel Aviv." *Id.* ¶ 104.  We likewise decline to give comparator weight to an undefined crowd.  Therefore, we will confine our analysis to the seven individuals named in Wax's complaint.

[50] *See* Charging Document of Dean Ruger.

[51] Compl. ¶ 2.

[52] Pl. Br. at 29.

[53] Compl. ¶ 33.

[54] At oral argument, plaintiff's counsel acknowledged that they cannot bring a First Amendment claim.  Oral Argument Tr., June 16, 2025, 7:20-21.